U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 APR 26  PM 3: 52

CLERK
BY
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

ALEXIS M.-M.,                    )
                                 )
        Plaintiff,               )
                                 )
        v.                       )          Case No. 5:21-cv-14
                                 )
KILOLO KIJAKAZI, Acting Commissioner )
of Social Security,              )
                                 )
        Commissioner.            )

**OPINION AND ORDER**
**(Docs. 12, 13)**

Plaintiff Alexis M.-M. brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3),

requesting reversal of the decision of the Commissioner of Social Security ("Commissioner")

denying her application for Title II Child's Insurance Benefits and Title XVI Supplemental

Security Income or, in the alternative, a remand to the Commissioner for further proceedings.

(Doc. 1.) Pending before the court are Plaintiff's Motion for Order Reversing Commissioner's

Decision (Doc. 12) and the Commissioner's Motion for Order Affirming the Decision of the

Commissioner (Doc. 13).

For the reasons stated below, Plaintiff's motion is GRANTED in part; the

Commissioner's motion is DENIED.

**Factual Background**

Plaintiff was 18 years old on her alleged onset date of April 7, 2016. (AR 55.) At a

May 21, 2020 telephonic hearing, Plaintiff testified that in addition to chronic kidney disease

associated with her kidney transplant, she is physically affected by fatigue, asthma, severe atopic

dermatitis, pain, a back fracture, and a compromised immune system. (AR 97.)

Plaintiff was born with a congenital nephrotic syndrome and diffuse mesangial sclerosis. (AR 1124.) She developed renal failure at six weeks old and received a kidney donated by her mother on June 14, 1999. (AR 17.) Since her kidney transplant, she has been treated with immunosuppressive medications to prevent rejection of the kidney. (AR 2810.)

The medical record reflects long-standing diagnoses for chronic kidney disease, which has progressed from stage I/II (mild) to stage III/IV (moderate/severe).[1] (AR 15, 17, 30, 1285.) Prior to her onset date, Plaintiff's chronic state of immunodeficiency and her poor renal function caused several bouts of serious illness, including adenoviral pneumonia, Epstein-Barr virus, cerebritis, meningitis, chronic UTIs, hypertension, respiratory infections, seizures with hyponatremia, asthma, atopic dermatitis, eczema, gout, MRSA, and H1N1 influenza. (AR 1124.) After a largely successful kidney transplant surgery in 1999, Plaintiff was fed periodically through a feeding tube until age five, and was occasionally re-hospitalized for renal abscesses and illness throughout adolescence. (AR 543, 1125.) Plaintiff's medical record reflects frequent hospitalizations until age 15 for infections, seizures, and transplant complications. (AR 1125.) In November 2016, Plaintiff suffered a hernia and underwent surgery to repair the abdominal wall. (AR 1138–1139, 1284.)

As a result of her renal disease, Plaintiff is unusually short in stature. (AR 19, 27, 103.) She is approximately 4 feet and 7 inches tall, and weighs between 90 and 111 pounds. (AR 103.) Since her onset date, Plaintiff has been between the second and fifth percentile for weight compared to other women in her age group. (AR 847.) Her stature places her at less than the first percentile. (AR 849.)

---

[1] Stage IV chronic kidney disease is "the start of end stage kidney disease" and is expected to cause the following symptoms: fatigue, fluid retention, lower back pain, sleep problems, discolored urine, increased urination, and bone disease. (AR 529.)

Plaintiff testified that her back fracture limits her spinal mobility and causes ongoing back pain. (AR 104.) She estimates that she could lift "[m]aybe five pounds" if she does not have to bend her back. (AR 104.) Plaintiff also testified that she is able to stand comfortably for 20 or 30 minutes before her legs, feet, and back hurt. (AR 105.) In her Function Report, Plaintiff wrote, "due to my eczema I am up [at night] itching; Hard to find a good position [to sleep] due to back pain." (AR 432.)

Plaintiff is prescribed prednisone, a steroidal medication, as an immunosuppressant to prevent rejection of her transplanted kidney and to treat eczema and dermatitis. (AR 446, 761.) Due to long-term prednisone use, Plaintiff developed osteopenia in 2017, progressing to osteoporosis in 2018. (AR 1098, 1203.) Plaintiff reports bone and joint pain due to osteoporosis. (AR 104.) At a physical therapy appointment on March 6, 2020, Plaintiff said her back and neck pain is "5/10 at best" and "8/10 at worst," and is "aggravated by lifting anything, walking, dressing and grooming." (AR 3087.) Plaintiff's physical therapist described her condition as "chronic" and "will include relapses which are unpredictable in nature." (AR 3088.) The physical therapist's findings reflect limited cervical and shoulder flexion, extension, and pulling, with accompanying pain. (*Id.*) On the Owestry Disability Index, plaintiff received a score of 36, which corresponds with a finding of "moderate disability." (AR 3088.)[2]

Plaintiff testified that her conditions cause fatigue. She testified that every day she either sleeps in or naps during the day. (AR 99–100.) She estimates that she sleeps 10 hours each day, and feels tired, groggy, inattentive, and drained before and after napping. (AR 100.) Plaintiff testified that her fatigue worsens when she is sick. (AR 102.) For instance, Plaintiff caught

---

[2] "The Owestry Disability Index is the most commonly used outcome measure for low back pain." Owestry Disability Index Scoring Made Easy, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2647244/ (last visited Feb. 28, 2022).

pneumonia in November 2019 and was out of school and in bed for two weeks with fatigue. (*Id.*) Plaintiff also experiences fatigue during menstruation, writing, "my periods are very hard on my body giving me low grade fevers and I just want to sleep. I usually get it 2 [times] a month." (AR 438.) Sometimes her periods can last 3–4 weeks at a time. (AR 454.) Due to fatigue and illness, Plaintiff misses "school or other events that I would like to attend." (AR 438.)

Plaintiff is prescribed several medications.[3] Many of these medications have serious known side effects. These side effects include "suppressed immune system"; "osteoporosis and tight muscles"; "drowsiness"; "eye irritation"; "conjunctivitis"; "stomach irritation" and "irregular periods." (AR 438, 458.)

Plaintiff testified at the hearing about her daily activities and personal life. Plaintiff's daily activities include chores, meditation, homework, TV, writing, painting, errands, going outside, and spending time with family. (AR 198, 432.) She prepares full meals, does laundry, vacuuming, and cleans dishes. (AR 198, 432–434.) Plaintiff reports that during these activities at home she has trouble "bending to get things." (AR 433.) She can lift 5 to 10 pounds but can't bend due to injury, and says she is often ill. (AR 198.) Plaintiff reports that she tires easily when standing and can walk less than a mile. (AR 436.) Plaintiff testified that she occasionally goes grocery shopping, but sometimes "would have problems lifting things." (AR 106.) Plaintiff also reports finding it "hard to put pants and socks on" and sometimes has trouble bathing "when I need to get soap it causes pain to bend." (AR 432.)

Plaintiff qualified for a Section 504 plan in high school and college on the basis of her physical impairments. (AR 96, 98.) Despite her Section 504 accommodations, Plaintiff testified

---

[3] As of June 16, 2020, Plaintiff had 34 active prescriptions. (AR 28–29.)

that she frequently missed days in high school due to surgeries, illness, and medical appointments. (AR 96–97.)

At the time of the hearing, Plaintiff was a sophomore at Northern Vermont University in Johnson, Vermont where she majors in art. (AR 105, 108.) Plaintiff testified that her disability accommodations in college allow her to schedule her daily routines "how I need it to fit my lifestyle." (AR 98.) Plaintiff is allowed extended classroom time and testing times. (AR 98, 102.) She testified that she also has flexibility to request extensions on assignments if necessary. (AR 98.) Her college accommodation allows Plaintiff to miss classes for appointments or for illness if she communicates absences in advance. (AR 98.)

Plaintiff testified that although some of her college classes require her to be physically active, accommodations allow her to participate despite her physical limitations. For instance, Plaintiff testified that she took a drawing class that required students to stand, but that she was allowed to sit as needed when her feet and back began to hurt. (AR 105–106.) In addition, Plaintiff testified that she was enrolled in a mandatory freshman dance class, but that she was "allowed to sit out and watch and take notes" because she "couldn't do" the class. (AR 106.) She also notes that although dancing used to be a hobby, since the progression of her illnesses, "dancing has become harder on my body." (AR 435.)

Plaintiff filed an application for disabled adult child benefits based on disability on July 24, 2018. (AR 52.) She also filed a Title XVI application for supplemental security income on March 18, 2019. (*Id.*) These claims were denied on January 4, 2019 and upon reconsideration on May 14, 2019. (*Id.*) Administrative Law Judge ("ALJ") Matthew G. Levin held a hearing on February 6, 2020, but no testimony was taken on this date. (AR 153–159.) On May 5, 2020, a supplemental telephonic hearing was held. (AR 110–152.) Medical expert Regina Lilly, M.D.

and vocational expert ("VE") Jennifer Guerdiri gave testimony and were cross-examined by

Plaintiff's counsel, Mr. James Torrisi. (*Id.*) Plaintiff testified by telephone during a third hearing

held on May 21, 2020. (AR 91–109.) During this hearing, Plaintiff amended her alleged onset

date to April 7, 2016, the date of Plaintiff's 18th birthday. (*Id.*)

Plaintiff was admitted to the hospital for emergency medical treatment from May 29,

2020 through June 1, 2020 for edema. (AR 3096–3158.) These records were included in the

record and were considered by the ALJ. (*See* AR 53, 64.)

### ALJ Decision

Social Security Administration regulations set forth a "five-step, sequential evaluation

process" to determine whether a claimant is disabled. *Estrella v. Berryhill*, 925 F.3d 90, 94

(2d Cir. 2019) (quoting *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014)). The same five-

step inquiry applies to the analysis of DAC benefits as to other adult disability cases.

*See Hanlon v. Saul*, No. 18-CV-7090 (PKC), 2020 WL 999900, at *2 (E.D.N.Y. Mar. 2, 2020).

First, the Commissioner considers "whether the claimant is currently engaged in

substantial gainful activity." *Id.* Second, if the claimant is not currently engaged in substantial

gainful activity, then the Commissioner considers "whether the claimant has a severe impairment

or combination of impairments." *Id.* Third, if the claimant does suffer from such an impairment,

the inquiry is "whether the impairment meets or equals the severity of the specified impairments

in the Listing of Impairments." *Id.* Fourth, if the claimant does not have a listed impairment, the

Commissioner determines, "based on a 'residual functional capacity' assessment, whether the

claimant can perform any of his or her past relevant work despite the impairment." *Id.*

Finally, if the claimant is unable to perform past work, the Commissioner determines

"whether there are significant numbers of jobs in the national economy that the claimant can

perform given the claimant's residual functional capacity, age, education, and work experience." *Id.*; *see* 20 C.F.R. §§ 404.1520, 416.920.[4] The claimant bears the burden of proof at steps one through four. *Estrella*, 925 F.3d at 94. At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

Employing the sequential analysis, ALJ Levin first determined that Plaintiff has not engaged in substantial gainful activity since April 7, 2016, the alleged onset date. (AR 55.) At step two, the ALJ found that Plaintiff had two severe impairments during the relevant period: (1) chronic kidney disease, status post kidney transplant; and (2) osteoporosis/osteopenia. (*Id.*) The ALJ noted that these severe impairments significantly limited Plaintiff's ability to perform basic work activities as required by SSR 85-28. (*Id.*) The ALJ determined Plaintiff's diagnoses for (1) atopic dermatitis/eczema; (2) hernia, post-surgical repair; (3) asthma; and (4) anxiety and depression were non-severe. (AR 55–56.) The ALJ also concluded that Plaintiff's symptoms associated with hypertension medication to be non-severe. (AR 56.)

At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App'x 1. (AR 58.) The ALJ specifically referred to listings 6.03 (chronic kidney disease with chronic hemodialysis or peritoneal dialysis), 6.04 (chronic kidney disease with kidney transplant), 6.05 (chronic kidney disease with impairment of kidney function), 6.09 (complications of chronic kidney disease), and 1.06 (fractures). (*Id.*)

---

[4] Sections 404 and 416 are the same in all respects, except that Section 404 relates to Title II claims and Section 416 relates to Title XVI claims. This decision cites to Section 416 throughout.

7

Next, the ALJ determined that Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b) except as follows:

> [S]he can lift up to 10 pounds frequently and 21–50 pounds occasionally; she can sit for 6 hours, stand for 6 hours, and walk for 4 hours in an 8-hour workday; she can frequently climb stairs; occasionally climb ladders, ropes, and scaffolds; occasionally balance (further defined as needing to avoid narrow, slippery, or erratic moving surfaces); she should avoid stooping, kneeling, crouching, and crawling; she can occasionally push/pull bilaterally with the upper extremities; frequently handle, finger, reach in all directions with the bilateral upper extremities; she should avoid hazards (i.e., dangerous machinery and unprotected heights); she should avoid driving; she should avoid concentrated exposure to humidity, dusts, fumes, odors, gases, poorly ventilated areas, temperature extremes, and vibrations; she would need to take a 10-minute break every 2–3 hours to use the restroom (and this break can coincide with regularly scheduled breaks); she should avoid physical interaction with the general public; she should have at least 6 feet of social distancing space from coworkers and supervisors; and she should avoid jobs with exposure to molds and fungus.

(AR 58–59.)

At step four, the ALJ concluded that Plaintiff has no past relevant work experience. (AR 68.) Considering the Plaintiff's age, education, work experience, and RFC, the ALJ determined that there are jobs that exist in significant numbers in the national economy that the claimant can perform. (*Id.*) ALJ Levin concluded that Plaintiff has not been under a disability from April 7, 2016. (AR 69.)

The ALJ found the medical opinion of non-examining medical expert Regina Lilly, M.D., M.P.H. persuasive. (AR 63.) The ALJ found the more restrictive medical opinion of Plaintiff's life-long primary care provider Alexandra Bannach, M.D. "less than fully persuasive." (AR 65.) The ALJ did not find any of Plaintiff's other treating medical sources fully persuasive.

## **Standard of Review**

The Social Security Act (the "Act") defines disability, in pertinent part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

8

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Under the Act, a claimant will only be found disabled if his "impairments are of such severity

that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the

national economy." *Id.* § 423(d)(2)(A).

In considering the Commissioner's decision, the court conducts "a plenary review of the

administrative record to determine if there is substantial evidence, considering the record as a

whole, to support the Commissioner's decision and if the correct legal standards have been

applied." *Estrella*, 925 F.3d at 95 (quoting *Cichocki v. Astrue*, 729 F.3d 172, 175–76

(2d Cir. 2013) (per curiam)); *see also* 42 U.S.C. § 405(g). Substantial evidence means "more

than a mere scintilla"—it means, "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting

*Consol. Edison Co. of N.Y. v. Nat'l Lab. Rels. Bd.*, 305 U.S. 197, 229 (1938)). The "substantial

evidence" standard is even more deferential than the "clearly erroneous" standard; facts found by

the ALJ can be rejected "only if a reasonable factfinder would *have to conclude otherwise.*"

*Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (quoting

*Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis in the original). The court is

mindful that the Act is "a remedial statute to be broadly construed and liberally applied."

*Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

<u>**Analysis**</u>

Plaintiff argues the ALJ erred by improperly evaluating the medical evidence, including

the opinions of the treating physician, and improperly applied the medical source regulations.

Specifically, Plaintiff argues Dr. Lilly's opinion should not have been found persuasive because

(1) Dr. Lilly incorrectly summarized Plaintiff's kidney function and activities of living, and these "faulty conclusions" tainted the ALJ's analysis (Doc. 12 at 4–5); (2) the records Dr. Lilly reviewed in November 2019 were stale as they did not include Plaintiff's subsequent hospitalization and edema (*id.* at 5); and (3) Dr. Lilly's opinion about Plaintiff's subjective symptoms, including fatigue, did not comply with the regulatory framework. (*Id.*) Plaintiff argues that the ALJ's analysis of Dr. Bannach's opinion relied upon "misleading, inaccurate and out-of-context assertions." (*Id.*) Plaintiff also argues that the ALJ did not consider whether the combined effect of Plaintiff's impairments was of sufficient medical severity to be the basis for eligibility of benefits as required by regulation. (*Id.* at 7 (citing 20 C.F.R. § 404.1523(c)).) Finally, Plaintiff argues that in addition to supportability and consistency, the second-tier factors for evaluating medical opinions "add heft to Dr. Bannach's opinion," and should have been considered. (Doc. 12 at 8.)

In response, the Commissioner argues that the ALJ's analysis complied with the applicable regulations and is supported by substantial evidence. (Doc. 13 at 1.) The Commissioner contends that the ALJ's subjective symptom evaluation was supported. (*Id.* at 3.) The Commissioner refutes Plaintiff's argument that the evidence was stale, arguing that the post-June 10, 2020 hospitalization and labs did not sufficiently alter the weight of evidence so as to require remand. (*Id.* at 4–5.)

After considering these claims and reviewing the record, the court finds that the ALJ's decision is not supported by substantial evidence. On remand, ALJ Levin is instructed to: (1) consider whether the mischaracterization of evidence errors identified in this opinion would result in a different RFC determination; (2) adopt the court's findings with respect to the supportability and consistency of Dr. Lilly's medical opinion; (3) reconsider Plaintiff's

subjective symptom of fatigue; (4) reconsider Dr. Bannach's opinion regarding medical absences; and (5) conduct a new RFC analysis considering the combined effect of all of Plaintiff's limitations, including the effects of fatigue, chronic pain, frequent illness, menorrhagia, anxiety, depression, chronic kidney disease, and other impairments not discussed in-depth in this decision.

## I.   Medical Evidence

The court begins by reviewing the regulations that apply to the evaluation of medical evidence. "Previously, the Social Security Administration followed the 'treating physician rule,' which generally afforded controlling weight to the opinion of a claimant's treating physician so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Dany Z. v. Saul*, 531 F. Supp. 3d 871, 881 (D. Vt. 2021) (alteration in original) (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)). However, "[u]nder the new regulations, ALJs do not defer to, or give specific evidentiary weight to, any medical opinions." *Dany Z.*, 531 F. Supp. at 881; *see also* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, "ALJs must evaluate medical opinions according to the following factors: supportability, consistency, relationship with the claimant (this factor has five sub-factors), specialization, and other factors." *Id.* (citing 20 C.F.R. § 416.920c(c)(1)–(5)). "The most important of these factors are supportability and consistency." *Id.* (citing 20 C.F.R. § 416.920c(b)(2)). The ALJ is required to consider supportability and consistency, but need not provide an explanation for the remaining factors unless the ALJ is differentiating between different medical opinions of equal support and consistency. 20 C.F.R. § 416.902c(b).

The court first addresses whether the ALJ's treatment of Dr. Lilly's medical opinion complies with the applicable regulations. The court next addresses certain factual inaccuracies pervading both Dr. Lilly and the ALJ's analysis. Last, the court considers whether the ALJ's discussion of Plaintiff's subjective symptoms complied with the medical record and addresses Plaintiff's concern that Dr. Lilly relied upon stale medical evidence in forming their opinions. The court finds that the ALJ's analysis did comply with the relevant regulations. The court also finds that the ALJ's subjective symptom analysis regarding back pain was supported by the record and complied with the regulations, and that the medical evidence that Dr. Lilly and the ALJ considered was not "stale." However, based on the record as a whole, the court concludes that the factual mischaracterizations adopted in Dr. Lilly's medical opinion taint the ALJ's analysis and render portions of his opinion unsupported by substantial evidence.

### A.    Regina Lilly, M.D., M.P.H.

Dr. Lilly, a Board-certified Nephrologist, completed a Medical Statement of Ability to do Work-Related Activities (Physical) on November 4, 2019. (AR 2988–2993.) She also testified as a medical expert at the May 5, 2020 hearing. (AR 115, 116.)

Dr. Lilly based her medical opinion upon a review of Plaintiff's medical record; she did not examine Plaintiff in-person.

### 1.    Persuasiveness Determination

ALJ Levin found Dr. Lilly's medical opinion persuasive. He wrote:

> she is a medical expert who is board certified in internal medicine and nephrology, she reviewed nearly all of the evidence of record, she provided an extensive explanation for her opinion and supported her opinion with detailed citations to the record, and she was subjected to cross-examination by the claimant's representative.

(AR 63–64.) ALJ Levin also wrote that Dr. Lilly "supported her opinion by explaining the reasoning for her assessment and citing to the evidence of record." (*Id.*)

12

The new medical regulations require the ALJ to consider the supportability and consistency of the medical opinion in determining persuasiveness. 20 C.F.R. § 416.902c(b)(2). In the persuasiveness analysis, the "ALJ must not only consider supportability and consistency in evaluating medical source opinions but most also explain the analysis of these factors in the decision." *Prieto v. Comm'r of Soc. Sec.*, No. 20-cv-3941(RWL), 2021 WL 3475625, at *9 (S.D.N.Y. Aug. 6, 2021) (citing 20 C.F.R. § 404.1520c(b)); *Vellone v. Saul*, No. 1:20-CV-261 (RA)(KHP), 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021), *R. & R. adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021) ("in cases where the new regulations apply, an ALJ *must* explain his/her approach with respect to the first two factors when considering a medical opinion")). Moreover, the ALJ must consider "the conflicting opinions of the *treating* medical sources," to the extent these conflict with non-examining medical sources. *Shawn H. v. Comm'r of Soc. Sec.*, No. 2:19-cv-113, 2020 WL 3969879, at *6 (D. Vt. July 14, 2020); 20 C.F.R. §§ 404.1520c(c)(3)(v), 416.920c(c)(3)(v) ("A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder."). An ALJ's failure to "examine what [the doctors] used to support their opinions and reach their ultimate conclusions" is legal error. *Brianne S. v. Comm'r of Soc. Sec.*, No. 19-CV-1718-FPG, 2021 WL 856909, at *5 (W.D.N.Y. Mar. 8, 2021); *Prieto*, 2021 WL 3475625, at *9 (citing cases).

ALJ Levin's persuasiveness analysis complies with the regulations. He makes specific findings and explains his reasoning under the supportability factor. Although the ALJ's consistency analysis is less developed, the ALJ also considered whether Dr. Lilly's opinion was consistent with the medical record and adequately explained his finding as to this factor.

The consistency analysis "includes consideration of factors such as whether the evidence conflicts with other evidence from other medical sources and whether it contains an internal conflict with evidence from the same medical source." 82 Fed. Reg. 5854.

Although the ALJ does not discuss consistency within the section analyzing Dr. Lilly's medical opinion, the ALJ wrote that Dr. Lilly's opinion is "more consistent with and better supported by the longitudinal objective evidence of record," than Dr. Bannach's opinion. (AR 66.) The ALJ did offer analysis regarding the consistency and supportability of Dr. Bannach's opinion, and concluded that these factors supported Dr. Lilly's opinion more than Dr. Bannach's. The ALJ also considered the second-tier factors of specialization, familiarity with the evidence, and cross-examination, even though these factors need only be considered when two or more sources are equally persuasive on the same subject. 20 C.F.R. § 416.920c(b)(3).[5] This analysis satisfies the regulatory requirement that the ALJ specifically address the consistency of a medical opinion in the persuasiveness analysis.

## 2.    Inaccurate Factual Statements

Plaintiff argues that factual inaccuracies in Dr. Lilly's medical evaluation and testimony tainted her opinion and render the ALJ's analysis unsupported by substantial evidence. (Doc. 12 at 4.) An ALJ's evaluation of a medical opinion "cannot be based on unsupported interpretation of raw medical evidence or mischaracterizations of the record." *Marrero Santana v. Comm'r of Soc. Sec.*, No. 17-CV-2648 (VSB) (BCM), 2019 WL 2330265, at *10 (S.D.N.Y. Jan. 17, 2019) (citing *Henderson v. Berryhill*, 312 F. Supp. 3d 364, 369 (W.D.N.Y. 2018)). "One or two factual

---

[5] ALJ Levin considered these secondary factors to bolster Dr. Lilly's medical opinion, but did not consider the relationship with the claimant, length of the treatment relationship, frequency of examinations, purpose and extent of the treatment relationship, or examining relationship in his analysis of Dr. Bannach's medical opinion.

inaccuracies may amount to harmless error," but where "the ALJ made numerous factual errors," remand is appropriate. *Chandler v. Soc. Sec. Admin.*, No. 5:12-cv-155, 2013 WL 2482612, at *8 (D. Vt. June 10, 2013).

Dr. Lilly's medical opinion relies upon factual errors. Dr. Lilly draws several flawed conclusions about Plaintiff's daily activities, diagnoses, and physical abilities. These mischaracterizations of fact are intertwined with her medical opinion and render her evaluation of the severity of Plaintiff's impairments inconsistent with the medical and other evidence in the record. The ALJ adopted Dr. Lilly's medical opinion and her functional limitations in determining the RFC.

The most glaring errors in Dr. Lilly's understanding of Plaintiff's daily activities and physical abilities relate to walking and dance class. Dr. Lilly estimated that Plaintiff could sit or stand for six hours without interruption, walk four hours without interruption, and complete the same number of hours in a total eight-hour workday. (AR 2989.) In support of these estimates, Dr. Lilly writes that Plaintiff travels to Michigan for college; does not have osteoporosis; attends college; walks on campus; and attends dance class. (*Id.*) But Plaintiff testified that she does not travel out-of-state for college. (AR 104.) Plaintiff also notes that she walks at most five to ten minutes at a time between buildings on her small campus, and that she was enrolled in a mandatory dance class but could not physically participate. (AR 106.) Instead of dancing, she "was allowed to sit out and watch and take notes." (AR 106.)

The ALJ does not adequately explain why he adopted Dr. Lilly's medical opinion in his RFC finding despite drawing factual conclusions materially different from those contained in Dr. Lilly's analysis. Although the ALJ correctly notes that Plaintiff was "allowed to rest if needed" during the dance class, he does not explain why he nevertheless adopts Dr. Lilly's opinion that

relies on Plaintiff's participation in dance class as evidence of her physical ability. (AR 59.) The ALJ acknowledged that Plaintiff denied walking more than 5–10 minutes at a time while living on campus but did not explain whether these short walks on campus were consistent with Dr. Lilly's estimate that Plaintiff could walk 4 hours per day. (*Id.*) And although the ALJ recognized that Plaintiff did not actively participate in dance class, he failed to address that Dr. Lilly cited Plaintiff's participation in dance class as positive evidence of physical ability. (*Id.*) Even if the ALJ corrected Dr. Lilly's misstatements of fact, the ALJ erred in failing to explain why he adopted her functional assessment despite its inconsistencies with the medical and other evidence.

Dr. Lilly and ALJ Levin reference Plaintiff's college attendance as evidence that she is a "functioning individual." (AR 2997.) In response to the question, "does the objective medical evidence of record support the claimant has fatigue," Dr. Lilly simply writes, "No." (*Id.*) She elaborates: "[f]atigue subjective and not documented as a limitation . . . records reflect a functioning individual (sexually active, going to college)." (*Id.*) In his decision, the ALJ cites Plaintiff's college attendance as, among other things, evidence that her anxiety and depression are not severe (AR 56–57), evidence that her back pain was managed and treatable (AR 62), and evidence that her fatigue was not severe (*id.*).

Attending college does not independently support a finding that an individual is not disabled. *See Brown v. Colvin*, No. 5:13-CV-153, 2014 WL 2743246, at *1 n.1 (D. Vt. Jun. 17, 2014) (finding that a claimant who takes college-level courses could nevertheless be unable to work a 40-hour week). This is especially true—as is the case for Plaintiff—where the claimant is granted accommodations at school. Plaintiff's Section 504 accommodations at college permit

"[f]lexibility around class absences" and "flexibility on extended time for assignments." (AR 2935.)

Plaintiff testifies that she regularly depends upon these accommodations to succeed in school. (AR 98–99.) Indeed, even absent disability accommodations, several courts have noted that "the ability to attend college is 'far different from engaging in regular work, full-time or part-time.'" *Ackerman v. Colvin*, No. 13-CV-6675 (RLE), 2015 WL 1499459, at \*14 (S.D.N.Y. Mar. 31, 2015) (quoting *Chiappa v. Sec'y of Dep't of Health, Ed. & Welfare*, 497 F. Supp. 356, 361 (S.D.N.Y. 1980)); *see also Ressegiue v. Sec'y of Dep't of Health, Ed., & Welfare*, 425 F. Supp. 160, 164 (E.D.N.Y. 1977) (college attendance and good grades does not constitute substantial evidence that plaintiff was not disabled).

The mere fact that during the disability period Plaintiff was able to attend college on a modified schedule—with Section 504 accommodations for medical absences—is no proof that she was not suffering from fatigue or otherwise under a disability. *Ressegiue*, 425 F. Supp. at 164. Nevertheless, an ALJ may consider college attendance as one of many factors in evaluating the severity of a claimant's impairments. The ALJ did recognize that Plaintiff had accommodations at school (AR 59) and discussed these accommodations in some detail with Plaintiff during the hearing. (AR 98 ("I communicate with my professors because I have appointments or because I can't make it because I'm sick").) It would be fair for the ALJ to conclude that Plaintiff's ability to attend college is some evidence of the severity of her functional limitations in her day-to-day life. The ALJ's analysis of Plaintiff's college attendance was not a mischaracterization of evidence in the record.

Although the mischaracterizations of fact in Dr. Lilly's opinion regarding Plaintiff's participation in dance class and walking on campus do not amount to fabrication, these

17

conclusions reflect an incomplete—and thus inaccurate—recounting of the record. For example, where a claimant testified that "he could only focus on doing a [sudoku] puzzle about 10 to 15 minutes before he became frustrated by his pain," the ALJ's finding that the claimant enjoyed "mentally stimulating puzzles," and so "could not have significantly impaired concentration and persistence," was not supported by substantial evidence. *Wilson v. Colvin*, 213 F. Supp. 3d 478, 484–85 (W.D.N.Y. 2016) (cleaned up). In *Wilson*, as in this case, neither the medical expert nor the ALJ fabricated evidence to support their positions. Rather, Dr. Lilly and the ALJ adopted incomplete and flawed assumptions to engineer an image of a healthy, active, and energetic young woman not reflected in the record.

To the extent the ALJ's recitation of the facts are inapposite with Dr. Lilly's factual summary, the ALJ should have explained why he nevertheless adopted Dr. Lilly's opinion with little modification. The factual errors and underlying Dr. Lilly's medical opinion suggest Dr. Lilly's opinion is inconsistent with other evidence in the record and therefore of little persuasive value. On remand, the ALJ should correct the mischaracterizations of evidence identified in this section, and reevaluate whether, in light of these inconsistencies, Dr. Lilly's opinion remains persuasive.

### 3.    Subjective Symptoms – Back Pain

Plaintiff argues that the ALJ's analysis on subjective symptoms did not comply with the regulatory framework. Specifically, Plaintiffs argues it was error for the ALJ to find Plaintiff's subjective symptoms of pain and fatigue not well supported by objective evidence in the record. (Doc. 12 at 5.) Because the court discusses Plaintiff's reported symptoms of fatigue in more detail below, this section focuses on whether the ALJ's analysis of Plaintiff's subjective symptoms of back pain complies with the relevant regulatory framework.

The regulations provide that statements of subjective pain and other subjective symptoms cannot establish disability on their own. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). At the same time, "'objective' findings are not required in order to find that an applicant is disabled." *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003). Instead, the ALJ follows a two-step framework to evaluate allegations of pain and other subjective limitations. 20 C.F.R. § 404.1529(a). First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms. *Green-Younger*, 335 F.3d at 108 (citing 20 C.F.R. § 404.1529(b)). Second, "the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (citing 20 C.F.R. § 404.1529(a)).

Regarding Plaintiff's complaints of pain, Dr. Lilly testified that Plaintiff "has some issues" but that these limitations can be "appropriately resolved with physical therapy." (AR 118, 121.) Dr. Lilly described Plaintiff as "a rather active woman." (AR 119.) Dr. Lilly testified that Plaintiff experienced back pain and kyphosis. (AR 121.) ALJ Levin found that Plaintiff's symptoms were not consistent with the medical and other evidence in the record. (AR 60.) Noting that Plaintiff sought treatment for back and neck pain, the ALJ concluded that "she treated this pain on her own, with heating pads and rest, she did not endorse functional limitations to treating providers, and she presented without serious deficits on objective examinations." (AR 62.) The ALJ also notes that "[o]n objective examination . . . she was able to bend down and touch her knees but did not want to bend down further." (*Id.*)

The ALJ referred generally to Plaintiff's testimony and to reports of pain and range-of-motion limitations in the medical records, and appears to accept that Plaintiff experiences pain.

19

(AR 61 (noting complaints of "intermittent pain"), AR 62 ("endorsed pain in her lower back and hips").) The ALJ also examined the factors listed in 20 C.F.R. § 416.929(c)(3) and SSR 16-3p for pain symptoms.[6] The ALJ's consideration of the subjective symptoms is supported by substantial evidence and complies with the relevant regulations. The ALJ recognized that the longitudinal evidence demonstrated that Plaintiff regularly experiences pain but did not reflect that Plaintiff frequently reported functional limitations due to pain to her providers. (AR 62.)

The ALJ considered Plaintiff's daily activities (AR 59–60), treatment (AR 61–61), and measures to relieve pain, such as heat (AR 62). The ALJ further considered Plaintiff's medical history and diagnoses. (AR 59–62.) And the ALJ cited 20 C.F.R. § 416.929 and SSR 16-3 in his opinion. (AR 54, 59.)

Plaintiff sometimes endorsed functional limitations to treating providers and presented with deficits on objective examinations. At a pediatric nephrology visit on August 9, 2018, Plaintiff's treating source documented "tenderness and limited mobility of her hips/back when walking and moving around." (AR 2317.) In March 2020, a physical therapist noted limitations in Plaintiff's range of motion and that Plaintiff had difficulty walking more than short distances.

---

[6] These factors are:

    (i)       Your daily activities;

    (ii)     The location, duration, frequency, and intensity of your pain or other symptoms;

    (iii)    Precipitating and aggravating factors;

    (iv)    The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

    (v)     Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

    (vi)    Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

    (vii)   Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

(AR 3088.) Plaintiff's physical therapist wrote that she only had a "fair" prognosis to "[r]educe pain and increase function to enable patient to walk intermediate distances . . . and increase function to enable the patient to sit on selected surfaces comfortably" in the short term. (AR 3089.)

However, the ALJ is not bound to defer to any of these sources. Tenderness and limited mobility do not necessarily establish a functional deficit. The physical therapist did note some range of motion and pain limitations, particularly regarding walking and standing for long periods. But this evidence does not contravene the ALJ's finding that Plaintiff did not endorse functional limitations to providers and did not present with serious deficits on objective examinations.

The sources the ALJ cites to support his propositions regarding the consistency of Plaintiff's reported pain with the medical record support his opinion. The ALJ cites one page of the medical record showing a normal physical examination of extremities. (AR 62 (citing, *e.g.*, AR 2604 ("grossly normal movement of all extremities").) The other evidence the ALJ cites shows that Plaintiff regularly endorsed pain to her treating providers, but not whether this pain caused long-term functional limitations. (AR 62 (citing AR 1231 ("She has still been having pain and discomfort around her upper back around her neck and muscles"), AR 2315 (same), AR 2546 ("tired . . . lower back pain and pain in her hips. She feels these pains are more uncomfortable since she had her depo shot.").)

In sum, the ALJ followed the two-step framework for addressing subjective symptoms required by the regulations, and his conclusion that Plaintiff's back pain did not create serious functional limitations is supported by substantial evidence. (AR 62.)

### 4.   Staleness of Medical Evidence

Last, Plaintiff argues Dr. Lilly's opinion is unpersuasive because it is based on stale medical records that no longer reflected Plaintiff's medical condition at the time the ALJ rendered his decision. (Doc. 12 at 5.) "[M]edical source opinions that are conclusory, stale, and based on an incomplete medical record may not be substantial evidence to support an ALJ finding." *Camille v. Colvin*, 104 F. Supp. 3d 329, 343 (W.D.N.Y. 2015) (quotations omitted), *aff'd*, 652 F. App'x 25 (2d Cir. 2016).

The court finds that Dr. Lilly's medical opinion evaluating Plaintiff's physical limitations is not based on stale medical evidence. Between November 2019, when Dr. Lilly drafted her medical opinion, and the June 2020 administrative hearing, Plaintiff's diagnosis for osteopenia progressed to osteoporosis, and her diagnosis for chronic kidney disease had progressed to Stage III/IV. (AR 1098, 1203, 1285, 3022.) However, the remainder of Dr. Lilly's medical opinion— although it may be flawed in other respects—is otherwise derived from a current medical record.

Dr. Lilly indicated that the presence of osteoporosis instead of osteopenia might more severely limit Plaintiff's physical abilities. (*See* AR 2988 ("No osteoporosis, but report of fractures"), 2989 ("No osteoporosis.").)[7] These notes imply that her functional limitation assessment for Plaintiff might be more stringent had Plaintiff been diagnosed with osteoporosis.

But even if Dr. Lilly had known about Plaintiff's changed diagnosis, it is not clear that the symptoms of Plaintiff's illness had also progressed, nor what effect this change had on her functional limitations. It is also unclear whether Dr. Lilly would have changed her physical

---

[7] Dr. Lilly incorrectly testified that the only change in Plaintiff's medical record since November 2019 was that Plaintiff had started physical therapy. (AR 119.)

limitation estimates for lifting, carrying, sitting, standing, and walking had she known Plaintiff's diagnosis for osteoporosis. (AR 2988, 2989.) Based on this speculation alone, the court cannot reject Dr. Lilly's medical opinion as stale on this basis.

The ALJ did note Plaintiff's May–June 2020 hospitalization. (AR 52–53.) His conclusions regarding the reason for this hospitalization and its bearing on Plaintiff's medical record accurately reflect the record. Although the hospitalization further documents the progression of Plaintiff's chronic kidney disease to Stage III/IV, not Stage II as noted by the ALJ, Plaintiff has not shown how this change in diagnosis would affect the outcome in her case. The ALJ has already found Plaintiff's impairments to be "severe." Absent a showing of a worsening of symptoms that would render Dr. Lilly's opinion out-of-date, the court finds that Dr. Lilly's opinion and the ALJ's analysis were not based on stale evidence.

**B.     Alexandra Bannach, M.D.**

Plaintiff argues that the ALJ improperly found the medical opinion of Plaintiff's long-term treating physician Dr. Alexandra Bannach "less than fully persuasive." (Doc. 12 at 3; AR 65.) First, Plaintiff argues that even after the demise of the treating physician rule, the ALJ must still presume that treating sources have a better understanding of a claimant's impairments than a medical source who reviews only evidence in the record. (Doc. 12 at 4.) Second, Plaintiff takes issue with the ALJ's finding that Dr. Bannach's opinion is inconsistent with the medical record, arguing that the ALJ ignored extensive evidence of physical pain, fatigue, and illness that supported Dr. Bannach's opinion. (*Id.* at 5–6.) In response, the Commissioner argues that the ALJ's analysis complied with the regulatory framework because the new medical source regulations "eliminate the perceived hierarchy of medical sources [and] deference to specific medical opinions." (Doc. 13 at 5 (quoting *Kimberly M. S. v. Comm'r of Soc. Sec.*, No. 1:20-cv-

615-JJM, 2021 WL 2566755, at *2 (W.D.N.Y. June 23, 2021)).) The Commissioner further argues that "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve," and that the court should defer to the Commissioner's resolution of conflicting evidence. (Doc. 13 at 5 (quoting *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)).)

Dr. Bannach is Plaintiff's treating pediatrician and primary care provider. She has been Plaintiff's treating physician since birth. (AR 2769.) In a letter accompanying her medical assessment form, Dr. Bannach writes that given Plaintiff's "devastating" diagnoses and kidney transplant, "[i]t is a testimony to the miracles of modern medicine that she is even alive today." (*Id.*) In her medical opinion letter, Dr. Bannach lists "only a few" of Plaintiff's current and past medical problems that limit her ability to work. (*Id.*) These include chronic immunosuppression, reduced kidney function, chronic fatigue, chronic back pain, spinal compression fracture, osteopenia, chronic eczema, gout, depression, PTSD, and anxiety. (AR 2769–2770.) Dr. Bannach provides a non-exhaustive description of how these conditions affect Plaintiff's ability to work, including: reduced muscle strength, frequent illness, frequent medical appointments, strict drinking and voiding schedule, fatigue-induced absences, difficulty sitting and standing comfortably for long periods, limited ability to walk for long distances, and impaired social interactions in school. (*Id.*) Dr. Bannach concludes:

> Alexis is fortunate to be alive. Her medical problems, despite extremely successful treatments by a large team of medical specialists and excellent treatment compliance on the part of Alexis, have a lasting impact on her quality of life and make it impossible for her to carry out the work required to hold employment. This is in no part due to lack of motivation or trial by the patient but is completely out of her control. I cannot think of a patient in my entire practice who is more qualified to meet criteria for disability.

(AR 2770.)

Dr. Bannach completed a medical assessment which reflects similarly restrictive limitations. (AR 2771–2774.) Dr. Bannach references Plaintiff's documented diagnoses

24

throughout as explanation for her limitations. (*Id.*) Dr. Bannach opined that Plaintiff could lift or carry less than 20 pounds up to one third of an 8 hour day due to chronic back pain, spinal fracture, and osteopenia. (AR 2771.) She further opined that standing and walking are affected by Plaintiff's impairments, specifically chronic fatigue due to renal transplant, immunosuppressant therapy, anemia, and frequent illness. (*Id.*) She estimated that Plaintiff could sit, stand, or walk for 3 hours in an 8 hour day. (*Id.*) Dr. Bannach noted that fatigue is a symptom of kidney problems, and Plaintiff experiences chronic fatigue which "greatly impacts her ability to function." (AR 2770.) Last, Dr. Bannach wrote that frequent appointments as well as Plaintiff's documented history of missing school due to chronic fatigue and illness support a finding that Plaintiff would miss two or more days of school per month. (AR 2769–2770, 2772.)

ALJ Levin found Dr. Bannach's opinion "less than fully persuasive." (AR 65.) The ALJ concluded that Dr. Bannach's opinion was "inconsistent with her own treatment notes as well as the longitudinal evidence of record." (*Id.*) As examples of inconsistencies between Dr. Bannach's opinion and the medical record, the ALJ notes that Plaintiff "often denied fatigue or decreased energy"; "travel[ed] extensively by plane"; "walk[ed] everywhere on campus"; "ha[s] no problem with attendance or concentration"; and "participat[es] in a dance class twice per week." (*Id.*) The ALJ also opined that "Dr. Bannach's opinion that the claimant would be off task and absent from work frequently is speculative," noting that Plaintiff is able to "attend college without noted attendance problems." (AR 66.)[8]

As a preliminary matter, the court rejects Plaintiff's argument that the ALJ must presume that treating sources have a better understanding of a claimant's impairments than a medical

---

[8] Having already discussed the mischaracterization of the record regarding walking on campus and dance class above, the court notes only that the same errors of fact that pervade Dr. Lilly's opinion remain relevant in the ALJ's analysis of Dr. Bannach's opinion.

source who reviews only the evidence in the record. (Doc. 12 at 4.) While it is true that the applicable regulations suggest that the opinions of treating sources will often be persuasive, the regulations prohibit ALJs from deferring to the opinion of any medical source. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). The court finds no error on this point.

The court also clarifies that insofar as Dr. Bannach expressed any opinion that Plaintiff is deserving of disability or unable to engage in full-time work, the regulations indicate that such statements are reserved to the commissioner and are "inherently neither valuable nor persuasive." 20 C.F.R. §§ 404.1520b(c)(3), 416.920b(c)(3). The court further clarifies that the ALJ is under no obligation to consider factors other than supportability and consistency in evaluating medical opinions—such as the length of the treating relationship and frequency of examinations—except where two or more medical opinions are equally persuasive on the same issue. 20 C.F.R. § 404.1520c(b)(3). Thus the ALJ did not err in failing to discuss the relationship with the claimant in his analysis of Dr. Bannach's opinion.

For the reasons that follow, the court finds that the ALJ's analysis of Dr. Bannach's medical opinion does comply with the regulatory framework, but that the ALJ's conclusions regarding Plaintiff's symptoms of fatigue and absences—and Dr. Bannach's incorporation of these symptoms into her opinion—are not supported by substantial evidence. The ALJ erroneously concludes Dr. Bannach's medical opinion is not consistent with the record regarding Plaintiff's symptoms of fatigue because "the claimant often denied fatigue or decreased energy." (AR 65.) As explained below, the ALJ's finding that "the claimant often denied fatigue or decreased energy" and that "the claimant's allegations regarding fatigue were subjective and not documented in the record as a limitation" are not supported by substantial evidence.

### 1.  Fatigue

Where the severity of a claimant's diagnosis depends largely on self-reported symptoms, rather than on diagnostic testing, it is essential that the ALJ engage with the treating medical source's interpretation of subjective symptoms. This is especially true where subjective criteria—such as pain, fatigue, and mental condition—are central to the patient's impairment. *See Green-Younger*, 335 F.3d at 107. Treating sources form medical opinions based on their own observations and the patient's self-reported symptoms, and it is well-settled that "[a] medical diagnosis will often be informed by the patient's subjective description of his or her symptoms." *Stacey v. Comm'r of Soc. Sec. Admin.*, 799 F. App'x 7, 9 (2d Cir. 2020).

The new regulations "still recognize the 'foundational nature' of the observations of treating sources, and 'consistency with those observations is a factor in determining the value of any [treating source's] opinion.'" *Shawn H.*, 2020 WL 3969879, at *6 (alteration in original) (quoting *Barrett v. Berryhill*, 906 F.3d 340, 343 (5th Cir. 2018)). When a physician accepts what the patient is saying and incorporates their expression of their subjective experience into their notes and opinion, the court should rely on that opinion even if there is not any outwardly measurable manifestation of the impairment—as would be available for physical impairments. *See Flynn v. Comm'r of Sec. Sec. Admin.*, 729 F. App'x 119, 122 (2d Cir. 2018) (the treating provider's perspective remains important in cases involving subjective symptom reporting, as diagnosis depends not on x-rays or MRIs but rather "on less discretely measurable factors, like what the patient says in consultations."). Although the ALJ need not "'reconcile every conflicting shred' of medical evidence," the ALJ must at least expressly discuss conflicting evidence and explain why he or she is rejecting it. *Sesa v. Colvin*, 629 F. App'x 30, 33 (2d Cir. 2015) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).

The Commissioner is correct to note that it is the province of the ALJ—and not this court—to weigh conflicting evidence. (Doc. 13 at 5.) However, the court is not required to adopt the ALJ's resolution of conflicts in the record where the ALJ cherry-picks isolated instances of favorable evidence to manufacture ambiguity where there is none. *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) ("[I]t is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."). Accordingly, the court concludes that it was improper for the ALJ to rely on Plaintiff's occasionally normal reporting of energy and fatigue in examinations "while simultaneously ignoring the contrary conclusion of the very physicians who made the evaluations." *Stacey*, 799 F. App'x at 11.

The ALJ's analysis of Dr. Bannach's opinion regarding Plaintiff's fatigue does not reflect an accurate accounting of the evidence in the record. The ALJ wrote that Plaintiff "regularly denied symptoms of fatigue, decreased energy, or medication side effects." (AR 61.) The evidence the ALJ cites in in support of his finding that Plaintiff "regularly denied symptoms of fatigue" do not actually support his claim. (*See* AR 61–62, 65.) Only three of the ALJ's citations to the record indicate that Plaintiff ever denied fatigue or tiredness.[9] Several of the ALJ's citations do not reference fatigue at all.[10] And although it is true that the medical record occasionally notes "normal" or "stable" energy,[11] it is not true that Plaintiff *regularly* denied

---

[9] AR 62 (citing Ex. 6F (AR 1100 (no fatigue)); Ex. 31F (AR 2952 (negative for fatigue)); Ex. 6F (AR 1130 (no fatigue))).

[10] *See, e.g.*, AR 1114; AR 1259; AR 1262; AR 2548; AR 2691; AR 2805; AR 2817; AR 3130; AR 3146.

[11] *See, e.g.*, AR 874 (sleeping within normal limits in September 2016); AR 1080 ("normal sleep and appetite"); AR 1115 ("normal sleep and appetite and energy"); AR 1129–

these symptoms. Occasionally reporting "normal" or "stable" energy levels is not the same as "denying" fatigue. This is especially true for chronically ill individuals who endure a lower general baseline for wellbeing.[12]

Here, the ALJ did not mention—let alone expressly discuss—numerous mentions in the medical record documenting complaints of fatigue, decreased energy, and excessive sleep, nor the effect this fatigue had on Plaintiff's ability attend school and appointments. Plaintiff frequently reported severe back pain, fatigue, excess sleep, grogginess, malaise, and low energy.[13] Plaintiff's complaints of fatigue continued throughout the disability period, contradicting the ALJ's finding that Plaintiff "has more recently stopped reporting any symptoms

_____

1130 ("normal energy . . . no polyuria or fatigue"; 1135 (sleeping and appetite within normal limits).

[12] As one treating nurse commented in an intake evaluation for Plaintiff, "[d]ue to her chronic immunosuppressive state, clinical presentations and laboratory values are different and not always reliable and comparable to healthy individuals in Alexis, complicating evaluations." (AR 2621.)

[13] *See, e.g.,* AR 184 ("pain, malaise, weakness, fatigue"); AR 861 ("headaches, back pain, and feeling very groggy"); AR 862 ("gross hematuria with dysuria, not feeling well for 2–3 weeks. . . . Started on Clindamycin due to chills, headache, lower back pain . . . stopped due to fatigue and ongoing back pain . . . . Felt great on 11/13/16, started feeling worse again yesterday . . . fatigue."); AR 868 ("decreased energy and appetite"); AR 871 ("very tired. Sleeping 12 hours/day when she goes to school"); AR 872 ("decreased energy and appetite . . . tired appearing, but alert"); AR 874 ("very tired, achy"); AR 877 ("fatigue and back pain"); AR 878 ("fatigue"); AR 1094 ("back pain x 1 week, lower back; more pressure and aching . . . discomfort standing up, unable to find any comfort position, not able to sleep . . . limping secondary to pain, trial acetaminophen, heat, hydrocodone without any improvement. Limited options for pain management"); AR 1100 ("back pain . . . really bad, she has tried heat, ice, Tylenol – nothing helps. She can't sit, she can't lay down"); AR 1111 ("decreased energy and appetite"); AR 1123 ("feels blah—states she gets a cold every two weeks"); AR 1141 ("decreased energy and appetite"); AR 1129 (sleeps 8 – 10 hours per night); AR 2621 ("fatigued"); AR 1330 ("feeling poorly"); AR 1346 ("fatigue"); AR 1356 ("fatigued"); AR 2606 (admitted to Dartmouth-Hitchcock Medical Center for "fatigue, loss appetite, nausea, cold shakes"); AR 2641 ("feeling fatigued"); AR 2642–2643 ("fatigue is unfortunately a common complaint for Alexis"); AR 3009 ("claimant does appear to have fatigue").

of fatigue or decreased energy to treating providers." (AR 64.) For instance, Plaintiff reported fatigue during visits on June 5, 2017 (AR 1111 ("decreased energy and appetite")), October 24, 2018 ("fatigue, irritability, poor quality of life")), January 16, 2019 (AR 2621 ("feeling fatigued")), and was admitted to Dartmouth-Hitchcock Medical Center on February 20, 2019 for "fatigue, loss appetite, nausea, cold shakes" (AR 2606).

Plaintiff's diagnoses and the documented side-effects of her medications corroborate her subjective complaints of fatigue. 20 C.F.R. § 416.929(c)(3). Three of Plaintiff's medications list drowsiness or fatigue as a side-effect,[14] and fatigue is a common symptom of Chronic Kidney Disease. (AR 529.)

It was not error for the ALJ to consider Plaintiff's occasional travel in his analysis of whether Plaintiff's reported activities were consistent with Dr. Bannach's medical opinion. *See Donnelly v. Comm'r of Soc. Sec.*, 49 F. Supp. 3d 289, 306 (E.D.N.Y. 2014). At the same time, Plaintiff need not be an invalid in order to be found disabled. *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). Evidence of some travel might indicate what types of activities a claimant can perform but must still be considered in light of the objective and other medical evidence in the record.

---

[14] Three of Plaintiff's active prescriptions—Amlodipine (for high blood pressure), Cetirizine (for allergies), and Hydroxyzine (for skin itching and anxiety)—list fatigue or drowsiness as side effects. Amlodipine, U.S. National Library of Medicine: MedlinePlus, https://medlineplus.gov/druginfo/meds/a692044.html (last visited Feb. 16, 2022) ("drowsiness, excessive tiredness"); Cetirizine, U.S. National Library of Medicine: MedlinePlus, https://medlineplus.gov/druginfo/meds/a698026.html (last visited Feb. 16, 2022) ("drowsiness, excessive tiredness"); Hydroxyzine, Mayo Clinic: Drugs and Supplements, https://www.mayoclinic.org/drugs-supplements/hydroxyzine-oral-route/side-effects/drg-20311434 (last visited Feb. 16, 2022) ("unusual tiredness or weakness . . . drowsiness . . . severe sleepiness").

After reviewing the record, it is not possible to draw two conflicting positions from the evidence about Plaintiff's energy level and fatigue. *See Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009) ("If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the record and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.") (cleaned up). The only reasonable conclusion supported by the evidence in the record is that Plaintiff experienced chronic fatigue, low energy, and excessive sleep throughout the disability period. Accordingly, the ALJ's finding that Plaintiff "denied symptoms of fatigue, decreased energy, or medication side effects," is unsupported by substantial evidence in the record. (AR 61.)

### 2.     Sitting, Standing, and Walking

Dr. Bannach opined in August 2019 that Plaintiff could not sit stand or walk for periods of more than one hour. (AR 2770.) She subsequently noted that Plaintiff could sit, stand, or walk for three hours in an eight hour day, and that Plaintiff's standing and walking were affected by her impairments. (AR 2771.) The ALJ rejected Dr. Bannach's opinion on sitting, walking, and standing as unsupported by any objective findings in the record, as well as Plaintiff's daily activities. (AR 65.) He writes, "Dr. Bannach's opinion that it would be 'impossible' for the claimant to sit, stand, or walk for more than an hour . . . is overstated and highly restricted, it is not supported by any objective findings, and it is inconsistent with the claimant's reported activities, including frequent travel, throughout the record." (AR 65, 2770.)

There is some medical evidence in the record that Plaintiff's back pain and fatigue interfered with sitting, standing, and walking for long periods. However, this evidence does not support Dr. Bannach's highly restrictive opinion that it would be impossible for Plaintiff to sit, stand, or walk for periods of more than one hour at a time, or three hours total in an 8-hour

workday. In March 2020, Plaintiff visited with Sunrise Physical Therapy for evaluation and treatment for lower back and neck pain resulting from osteoporosis. (AR 3087.) The physical therapist noted that Plaintiff "can walk short distances, but pain prevents [her] from walking intermediate distances." (*Id.*) Plaintiff told her physical therapist that pain limits her ability to sit more than one hour and stand more than a half hour at a time. (*Id.*) After the evaluation, the physical therapist reported that Plaintiff "has a fair prognosis" to "[r]educe pain and increase function to enable patient to walk intermediate distances . . . and increase function to enable the patient to sit on selected surfaces comfortably." (AR 3089.)

This physical evaluation is consistent with Dr. Bannach's estimation that Plaintiff would not be able to sit, stand, or walk for longer than one hour at a time due to pain and other limitations. It is also consistent with Plaintiff's own testimony that she can walk for 30 minutes and stand for 20–30 minutes before she experiences pain. (AR 105, 108.) Indicia of pain while walking and limited mobility is mentioned during visits with other physicians. (*See, e.g.*, AR 2317 (Dr. Adam Weinsten notes "tenderness and limited mobility of her hips/back when walking and moving around"), AR 2620 ("pain level without meds 7/10 . . . interferes with daily activities – such as walking").) However, it is not clear that these physical evaluations are "objective findings" because they incorporate Plaintiff's self-reported symptoms.

Although the ALJ omits some evidence showing that sitting, walking, and standing for more than an hour at a time is difficult and painful for Plaintiff, the court cannot find that the ALJ's finding regarding Dr. Bannach's sitting, standing, and walking limitation is not supported by substantial evidence. Plaintiff's history of plane and car travel is some evidence that she can sit, stand, or walk for more than an hour at a time. And although the ALJ does not cite to them in his decision, there are other indications from the record that Plaintiff can sit for longer periods

than those defined in Dr. Bannach's opinion. (*See, e.g.*, AR 2417 ("She sat in the office chair for the full hour and exhibited no outward sign of physical pain while sitting still, but she stayed very still.").) Moreover, Plaintiff testified that on Tuesdays and Thursdays, she wakes up at 7:00, has two classes in the morning, eats lunch, and has class from 3:30 until 5:30. (AR 99.) This represents at least four hours of sitting, walking, and standing in some combination twice a week. While this is not evidence that Plaintiff could sit, stand, and walk in some combination for a period long enough to support full-time employment, this evidence indicates Dr. Bannach's opinion on sitting, standing, and walking was overly restrictive.

Although the ALJ need not address all conflicting medical evidence in the record, *see Sesa*, 629 F. App'x at 33, on remand, the ALJ should explain how he has considered Plaintiff's March 2020 physical therapy evaluation, and what effect, if any, this evidence has on Plaintiff's RFC determination regarding sitting, standing, and walking. The ALJ should also address VE Guediri's testimony that if an individual was limited to sitting, standing or walking, in any combination for less than eight hours per day, they would not be able to maintain any full-time work. (AR 144.)

### 3. Absences

The court turns to the ALJ's dismissal of Dr. Bannach's opinion that Plaintiff would be absent from work two or more days per month. In finding this portion of Dr. Bannach's opinion unpersuasive, the ALJ wrote that Dr. Bannach's opinion that Plaintiff would be "absent from work frequently is speculative and not supported by the longitudinal evidence of record, which reflects that the claimant is able to . . . attend college without noted attendance problems . . . [and] attend her follow up appointments with various treating providers." (AR 66.)

33

It is true that Plaintiff was able to attend follow up appointments with treating providers. But substantial evidence does not support the ALJ's finding that Plaintiff's absences are speculative. Rather, the record as a whole indicates that Plaintiff regularly misses school and other obligations due to fatigue, pain, frequent medical encounters, and chronic illness. Accordingly, the ALJ's finding that the longitudinal evidence of record does not support absences of two or more days per month is not supported by substantial evidence.

The ALJ's analysis of Plaintiff's absences is flawed for two reasons. First, the ALJ cherry-picks favorable evidence to find Plaintiff had "normal attendance" at school. Second, the ALJ rejects the only medical opinion attesting to absences due to medical impairments in the record and substitutes his own opinion about medical absences. Because the ALJ may not substitute his own opinion for that of a medical source, and there is no medical source found fully or partially persuasive in the record other than Dr. Bannach who provided an opinion on absences per month due to impairments, the ALJ should not have disregarded this opinion.

### a.      Objective Evidence

Where a claimant is likely to be absent from work as a result of her impairments or treatment, the ALJ must consider whether these absences would preclude an individual from maintaining full-time employment. *See Matos v. Comm'r of Soc. Sec.*, No. 17-CV-2371 (GBD)(SN), 2018 WL 4658801, at *9 (S.D.N.Y. July 16, 2018).

"An ALJ cannot recite only the evidence that supports his conclusion while ignoring contrary evidence." *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016). The parties do not dispute that the ALJ recited some "normal" findings regarding absences from school. However, the ALJ prioritized these records as evidence of normal attendance without reference to other

evidence relevant to a finding of medical absences. The ALJ offers no explanation as to what role, if any, this conflicting evidence played in his conclusions.

The medical record shows that during the disability period, Plaintiff frequently missed school because of illness, fatigue, and medically-necessary appointments. (*See* AR 861 ("Missed school days since last visit: 3 weeks and 3 days"); AR 1332 ("missed 10-12 days of school in the past 4 weeks due to illness"); AR 1422 ("missed a week of school because of worsening fatigue, ache, and a bit of a cough"); AR 2930 ("a few missed appointments because of health reasons").)

In support of his finding that Plaintiff had normal attendance in school, the ALJ cites only one mention in the record suggesting Plaintiff had normal attendance. (*See* AR 93 (citing AR 2604 ("normal attendance").) The other evidence ALJ Levin cites shows only that Plaintiff attends college, not that she does so without absences. (*See* AR 93 (citing AR 2641 ("Continues in online college classes"); AR 2940 (school transcript); AR 3087 ("Full time Student at Johnson College . . . able to attend school.").) Thus the ALJ recited the minimal evidence supporting his conclusion and ignored contrary evidence that Plaintiff's immunosuppressed state causes frequent illness, medically-necessary appointments, and fatigue that affect her ability to attend school or work full-time. This amounts to impermissible cherry-picking and therefore the ALJ's finding regarding work absences is not supported by substantial evidence.

#### b.    **Medical Opinion Evidence**

Dr. Bannach opines that Plaintiff would miss two or more days per month due to "[a]cute illness, appointments; fatigue." (AR 2772.) Dr. Lilly does not provide any opinion on whether Plaintiff's frequent illness or symptoms would lead to frequent absences. (*See* AR 2987–2990.) The ALJ did not find any other medical source persuasive who opined on Plaintiff's absences. In

the absence of a conflicting medical opinion on this issue, the ALJ should not have substituted his own opinion on medical absences for that of Dr. Bannach's.

It is improper for the ALJ to independently evaluate the evidence and substitute his judgment for that of a medical source. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). "[W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." *McBrayer v. Sec'y of Health & Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983) (internal quotation marks and citations omitted). In the absence of a supporting expert medical opinion, "the ALJ should not have engaged in his own evaluations of the medical findings." *Filocomo v. Chater*, 944 F. Supp. 165, 170 (E.D.N.Y. 1996).

Dr. Bannach had a longitudinal understanding of Plaintiff's medical history and symptoms. Her estimate that Plaintiff would miss two or more days per month due to impairments is based on first-hand medical experience treating Plaintiff's acute illness and fatigue. Although the ALJ concluded that Dr. Lilly's medical opinion was more persuasive than Dr. Bannach's opinion, he did not find Dr. Bannach's opinion unpersuasive and therefore should have adopted her opinion to the extent her opinion was not contradicted by Dr. Lilly's. The ALJ rejected Dr. Bannach's opinion that Plaintiff's impairment would result in frequent absences and supplanted his own opinion—unsupported by objective evidence in the record—finding Plaintiff would miss fewer than 2 days per work each month due to impairments. Because the ALJ cited no medical evidence to support his belief that Plaintiff would miss fewer than two days per month, the ALJ's substitution of his own judgment for that of a medical source was improper. *Rohan*, 98 F.3d at 970.

The ALJ's rejection of Dr. Bannach's work absence estimate is not harmless error. VE Guediri testified that "missing even one day a month from work on a consistent basis would be work-preclusive." (AR 146.) Had the ALJ adopted Dr. Bannach's opinion that Plaintiff would miss two or more days of work per month, he would have been compelled to find Plaintiff disabled. On remand, the ALJ should reevaluate whether Plaintiff would not miss more than one day of work per month based on Plaintiff's documented school absences and Dr. Bannach's uncontroverted medical opinion.

## II.    Residual Functional Capacity Determination

Plaintiff argues that the same errors and mischaracterizations of fact that pervade the ALJ's medical opinion analysis render the RFC determination unsupported by substantial evidence. The Commissioner responds that the RFC finding is supported by the opinion and testimony of Dr. Lilly and so should be affirmed. (Doc. 13 at 4.)

In making an RFC determination, the ALJ must consider all of the claimant's symptoms and the extent to which the claimed symptoms can reasonably be accepted as consistent with the objective medical and other evidence. 20 C.F.R. § 416.929. The ALJ is "required to take the claimant's reports of pain and other limitations into account," and failure to consider "all of the relevant medical and other evidence" in the RFC analysis is reversible error. *Genier*, 606 F.3d at 49–50; *see also* 20 C.F.R. § 416.929(c)(3), (d)(4).

The ALJ found that, among other restrictions, Plaintiff could sit and stand for six hours per day and walk for four hours per day. (AR 58.) The ALJ found that Plaintiff could "lift up to 10 pounds frequently and 21-50 pounds occasionally." (AR 58.) The ALJ declined to find that Plaintiff would be absent more than one day per month. (AR 66.) Based on this RFC finding and

the VE testimony, the ALJ determined that there were jobs that existed in the economy that Plaintiff could perform.

The ALJ adopted Dr. Lilly's evaluation of physical limitations in his RFC determination. Dr. Lilly wrote that Plaintiff could occasionally lift up to 50 pounds, though also notes that Plaintiff should "avoid heavy lifting" due to kidney transplant, groin placement, and report of fracture and osteopenia. (AR 2988.) Dr. Lilly indicates that Plaintiff can occasionally push/pull, but also writes that Plaintiff should "avoid push/pull" on the same page. (AR 2990.)

The ALJ did not explain why he assessed lesser limitations as to heavy lifting and pushing and pulling than those identified by Dr. Lilly, whose opinion was the least restrictive RFC opinion in the record. Nor did the ALJ explain how he considered the internal inconsistencies in lifting, pushing, and pulling in Dr. Lilly's RFC opinion. Instead, the ALJ characterized his assessment of Plaintiff's ability to lift, push, and pull as in agreement with Dr. Lilly's opinion despite these inconsistencies.

ALJ Levin's determination that Plaintiff could perform light work and lift up to 50 pounds occasionally is unsupported by substantial evidence. (AR 58.) It is facially unreasonable for the ALJ to conclude that a 22-year old woman with osteoporosis and a history of vertebral fractures—who measures 4 foot 7 inches tall and weighs less than 111 pounds—could lift 50 pounds at all, let alone up to one-third of a workday. On remand, the ALJ should evaluate what effect, if any, an amended RFC limitation on lifting weights greater than 20 pounds and limitations in pushing and pulling would have on the disability determination.

The ALJ did not err in finding Dr. Bannach's estimate that Plaintiff could sit, stand, and walk for at most three hours per day unpersuasive. However, the court concludes that substantial evidence does not support the ALJ's RFC estimate that Plaintiff can sit for six hours, stand for

six hours, and walk for four hours in an eight-hour workday. (AR 58.) As support for this finding, the ALJ generally discusses evidence that Plaintiff traveled via plane (AR 62–63), walks on campus (AR 62), walked without difficulty during a consultative examination (*id.*), and was able to get out of bed and ambulate independently during her recent hospitalization (AR 61). As discussed above, this evidence does not support Dr. Bannach's restrictive finding. But neither does this evidence support Dr. Lilly's estimate that Plaintiff could sit or stand for 6 hours or walk for 4 hours in an 8-hour workday. At most, the evidence shows that Plaintiff travels by plane occasionally, walks 5–10 minutes at a time on campus (AR 105), stands 20–30 minutes before needing to sit and rest (*id.*), and can walk less than a mile before needing to rest (AR 436). This evidence does not support the ALJ's RFC finding as to standing and walking, and the ALJ should revisit this analysis on remand.

Separately, the ALJ rejected the portion of Dr. Bannach's opinion finding Plaintiff would likely be absent for two or more days per month as "speculative" and "not supported by the longitudinal evidence of record." (AR 66.) The ALJ did so without explaining what alternative medical source in the record supported this finding. Because the VE testified that missing more than one day of work per month would be work-preclusive, the ALJ's failure to make a finding in this regard is not harmless error. On remand, the ALJ should conduct a new RFC analysis consistent with the findings in this decision.

## Conclusion

For the reasons stated above, the court GRANTS in part Plaintiff's motion for an order reversing the decision of the Commissioner (Doc. 12), DENIES the Commissioner's motion to affirm (Doc. 13), and REMANDS the case for further proceedings consistent with this opinion. SO ORDERED.

Dated at Rutland, in the District of Vermont, this 26th day of April, 2022.

Geoffrey W. Crawford, Chief Judge
United States District Court